Miller *vs.* Gould.

JONATHAN M. MILLER, plaintiff in error, *vs.* ARTEMUS GOULD, defendant in error.

THE GEORGIA RAILROAD AND BANKING COMPANY, plaintiff in error, *vs.* F. M. EDDLEMAN, defendant in error.

When a contract was made between two citizens of the late Confederate States during the war, on the 12th July, 1862, payable three years after date, the consideration of which was Confederate Treasury notes, the only circulating currency in the country at that time, and which was recognized as *lawful* by the assumed authority which had the *actual* possession and control over the country and people at the time the contract was made:

*Held,* That although the issuing of such notes by the assumed Confederate authority for the purpose of carrying on a war against the Government of the United States, may have been illegal as against that Government, and the citizens thereof, who, during the war, were under the *actual* protection of that Government, *outside* of the lines of the assumed Confederate authority; yet, such a contract made between citizens residing *within* the lines of the assumed Confederate

authority, in their ordinary business transactions between themselves, and having *no connection with the prosecution of the war against the United States,* is not an illegal consideration, as *between the contracting parties themselves,* they having made the contract under the assumed authority which was then over them, and which assumed authority, (whether rightful or otherwise, is not now the question,) *recognized* the currency as legal, and valid, *at the time the contract was made;* therefore, as between the *contracting parties themselves,* the plaintiff is entitled to recover:

*Held also,* That the contract in the record mentioned, is not such a contract made with the *intention,* and for the *purpose,* of aiding and encouraging the rebellion, as was contemplated, or is embraced within the provisions of the Constitution of this State.

BROWN, C. J., dissenting.

Assumpsit. Confederate Currency. Tried before Judge GIBSON. Richmond Superior Court. June Term, 1868.

The facts of No. 1 were these: Gould sued Miller upon the following promissory note:

$3,000 00. AUGUSTA, 12th July, 1862.

Three years after date, we jointly and severally promise to pay A. Gould, or order, three thousand dollars, with interest after one year, payable every six months, for value received.

JAMES FISH,<br>JONA. M. MILLER.

Miller plead that said note was void, because it was given for $3,000 00 in Confederate States Treasury notes, loaned to Fisher, and "that said Confederate States, at the time of said consideration, were a league and combination of certain States of the United States of America, in rebellion against said United States, and said notes of said Confederate States were issued for the purpose of aiding and abetting said rebellion, and then and there the plaintiff had knowledge thereof."

The plaintiff's attorney demurred to said plea.

The demurrer was sustained, and the plaintiff had judgment for the principal and interest on his note. The error assigned is the order sustaining the demurrer.

J. T. SHEWMAKE, W. HOPE HULL, JOHNSON & MONTGOMERY, for plaintiffs in error, made the following points: There can be no recovery upon a contract, the consideration

of which is illegal, whether by statute or as against public policy, citing Bk. of U. S. vs. Owens, 2 Peters, 527.  Craig vs. Missouri, 4 Peters, 410.   Walker vs. Johnson, 2 Cranch S. C. R., 173, 203, 208.  Code of Georgia, sec. 2703. 2 Wash. C. C. R., 98.   35th Geo. R., 320, 330, 364.  Armstrong vs. Toler, 11 Wheaton, 208.  Hunt vs. Knickerbocker, 5 John. R., 327.

The issue of Confederate Treasury notes was illegal—Law Review for January, 1868, page 304; for July, 1868, pages 604–5.  The Confederate Government was not a *de facto* government—Law Review for October, 1867, page 95 ; and if it were, acts done against the *de jure* government would be illegal—8th Bacon's Abr., 11.  The rebellion was contrary to law, etc.,—Constitution U. S., Art. III, Sec. III, and Art. I, Sec. VIII, clause 14, and the Preamble and 1st Brightly's Dig., 440.  Circulating such currency was illegal, etc.,—Chitty on Con., 657.  State Courts are bound by the decisions of the Federal Courts—Constitution U. S., Art. VI, clauses 2 and 3.

G. G. McWHORTER, J. GANAHL and H. W. HILLIARD, for defendants in error, replied :  " The consideration is legal and valid by the *lex-loci et lex temporis contractus,* because the Confederate States were then a *de facto* government— Vattel, secs. 292, 293 ; Proclamations and Acts of neutral foreign powers; Lincoln's Proclamations as to blockade, etc.; Acts of Congress, July, 1861, secs. 5 and 6 ; The Prize Cases, 2 Black U. S. S. C. R., 637, 689; The Circassia, 2 Wallace, 136 ; Mrs. Alexander's Cotton Case, Ib., 404, 423 ; Mouran vs. Insurance Co., 6th Wallace, 1015.  The contract will then be enforced—Story C. of L., 244, 248, 372; Randon vs. Toby, 11th Howard, 493, and Armstrong vs. Toler, *ante,* 17th Howard, 232.  Gould needs no aid from the illegal transaction, and therefore can recover—Simpson vs. Bloss, 7 Taunton, 246, 2 E. C. L., 346 ; Ingram vs. Mitchell, 30th Ga. R., 547.  The case of Showbridge vs. Macon, 2 Am. L. Review is opposed to Mrs. Alexander's Cotton Case, and overruled by Mouran vs. Insurance Co., 6th Wall. R., and

consequently it and Erskine's decisions in 35th Ga., are of no force. See Keppel vs. Petersburg R. R., by C. J. Chase, at Richmond.

## CASE NO. 2.

The Georgia Railroad and Banking Company, on the 14th of February, 1862, issued two certificates of deposit for $500 00 each, payable to the order of Eddleman. They were not paid; he sued upon them, and the main defense was that the deposits for which said certificates were issued were made in Confederate currency. He obtained a verdict for $1,000 00 and costs. The company moved for a new trial, it was refused, and the cause came up. Here it was by consent argued with the case of Miller vs. Gould above stated. The authorities cited were in the main those already stated.

JOHNSON & MONTGOMERY, W. HOPE HULL, for plaintiff in error.

H. W. HILLIARD, for defendant in error.

WARNER, J.

This was an action brought upon a promissory note by the plaintiff against the defendant. The note was executed on the 12th day of July, 1862, the consideration of which was the loan of three thousand dollars Confederate Treasury notes. The defence set up against the plaintiff's right to recover is, that the consideration for which the note was given, was *illegal* and void, for the reason, that said notes were originally issued by the *assumed* authority of the Confederate States, then in rebellion against the Government of the United States, for the purpose of aiding and abetting said rebellion, and that the plaintiff had knowledge thereof. It may be conceded, that the issuing of Confederate Treasury notes by the assumed authority of the Confederate Government, for the purpose of aiding and abetting the rebellion against the Government of the United States, was illegal, as against that Government and the citizens thereof, who, during the

Miller *vs.* Gould.

war, were under the actual protection of that Government, *outside* of the military lines of the assumed Confederate authority; still, the question to be answered and decided is, whether a contract made between two citizens residing *within* the military lines of the assumed Confederate authority, in their ordinary business transactions, having no connection with the prosecution of the war, the consideration of which contract was Confederate Treasury notes, is to be held illega and void, as between the *contracting parties themselves,* in view of the *facts* which existed at the time the contract was made.    At the time of making this contract between the plaintiff and defendant, the authority of the Government of the United States had been displaced within certain defined limits, and another government had been organized, which *assumed* to exercise dominion and control over the territory and people thereof.    Although the Confederate Government may have been an illegal usurpation of authority, as against the Government of the United States, still, it was *in fact* an organization capable of making war, and maintaining its authority for a time, over the territory and people embraced within its military lines.    The Government of the United States, in recognizing *belligerent* rights during the war, recognized *the fact* that a regular organized war existed, that the authority of the Government of the United States had been, for a time, displaced, by an organization of such formidable dimensions as to amount to an *organized war.*    During this state of things, the contract in question was made.    Under the law which existed at the time and place of making the contract, Confederate Treasury notes were *not illegal* as *between the contracting parties themselves.*    In fact, such notes constituted the only circulating medium in the country at that time, and the purchasing power thereof, at the time of making this contract, was but very little below that of specie. The contract was made between the parties in view of the law which *then existed,* and the consideration of the note was *lawful,* and recognized to be so by the *actual governing authority* then over them, whether rightful or wrongful, is not now the question; the contracting parties were bound to

obey it for the time being, and the contract was made in good faith in view of the law which was prescribed for their government by the governing authority which was over them at the time, and which had the *power to enforce it.* There-fore, as between the contracting parties themselves, at the time and place of making the contract, the consideration of the note was *not illegal.*

It does not appear that either of the contracting parties had any agency whatever in the *issuing* of the Confederate Treasury notes; they only dealt with these them as the common currency of the country after the same had been issued and put into circulation by the organized authority which assumed to govern them, and which *in fact* did govern them at the time when the contract was made, which assumed authority they did not have the power to control or resist. This ques-tion came before the Supreme Court of North Carolina at its June Term, 1867, in the case of Phillips vs. Hooker, North Carolina Rep., 194. Chief Justice Pearson, in delivering the opinion of the Court in that case, says: "In 1862 the con-test had assumed the magnitude and proportions of war, each party in its territorial limits had the boundaries of a mighty nation, and each party counted its people by millions. The Confederate States was recognized by the nations, and by the United States itself, as a *belligerent* power, entitled to the rights of war, and, in the exercise of its powers, it had issued paper as the representative of money, which excluded all other currency and constituted the only circulating medium of the country. The Government of the United States was unable to protect the people, and there was no currency but Confederate Treasury notes. In this condition of things, was every man to stay his ordinary avocations and starve, or else be tainted with treason, and be deemed guilty of an ille-gal act if he received a Confederate Treasury note? Was a judge to cease to do those duties required by the interests of hu-manity, the performance of which can never be considered as criminal, or was he to perform the duties and starve rather than commit an illegal act by receiving his salary in Confed-erate Treasury notes? Was the merchant to close his store,

Miller *vs.* Gould.

the blacksmith and shoemaker to quit work, and the farmer to let his tobacco and surplus grain rot on his hands, and allow his family to suffer for clothing and the other necessaries of life, or do an illegal act by receiving Confederate notes? Really, unless the receiving of such notes can be connected with a *criminal intent* to aid the rebellion, the question seems to me too plain to admit of argument. A naked statement exposes the absurdity of the proposition. The Courts must act on the presumption that Confederate notes were received in ordinary dealing, not for the purpose of aiding the rebellion, but because there was no other *currency.* It cannot be held that the mere receiving a Confederate note was illegal and base without involving in the imputation of baseness every man and woman in the State. The ministers of the Gospel, the judge who received his salary, the physician, the merchant, the mechanic, the farmer, who carried on his ordinary business, the poor seamstress who, at the end of the day, received her hard earned wages, were all guilty of an act so base that the doors of the courts of justice must be shut against them. The proposition is monstrous !!"

But it was insisted on the argument of this case that dealing in Confederate Treasury notes gave them credit and circulation, and thus aided and encouraged the rebellion. As well might it be said that the dealing in smuggled goods by a merchant or tradesman would aid and encourage smuggling. It is not pretended that either of the contracting parties now before the Court had anything to do with the original act of issuing and putting into circulation Confederate Treasury notes by the assumed Confederate Government. After the Confederate Treasury notes had been issued and put into circulation as currency by the assumed Confederate authorities, the parties dealt with it as they found it, the same being the only circulating medium in the country as the representative of money. Their contract was a new and independent transaction, after the illegal act of issuing the currency by the assumed Confederate authorities for the purpose of aiding and promoting the rebellion against the United States had

been done. The distinction between the original illegal act and a new, independent contract is thus stated by Story in his Treatise on the Conflict of Laws, "If the new contract is wholly unconnected with the illegal act, and is founded on a new consideration, and is not a part of the *original schéme*, it is not tainted by the illegal act, although it may be known to the party with whom the contract is made. Thus, if after the illegal act is accomplished, a new contract (not being unlawful in itself) is made by the importer for a sale of goods to a retail merchant, and the merchant afterwards sells the same to a tailor, or to a customer who had no participation whatsoever in the original illegal scheme, such new contract will be valid, although the illegality of the original importation is *known* to each of the venders at the time when he entered into the new contract." Story's Conflict of Laws, 375, section 248. Armstrong vs. Toler, 11th Wheaton's Rep., 258. Orchard vs. Hughes, 1st Wallace's Rep., 73. Rawdon vs. Toby, 11th Howard's Rep., 493. In the case last cited, the payment of a note was resisted on the ground that it was given in Texas for the purchase of negroes *illegally* imported from Africa some years before and sold into slavery. The Court said in that case : "If the defendant should be sued for his tailor's bill, and come into Court with the clothes made for him on his back, and plead that he was not bound to pay for them because the importer had smuggled the cloth, he would present a case of equal merit." So here the defendant borrowed the Confederate Treasury notes of the plaintiff the purchasing power of which, at the time he received them, was nearly equal to specie, and who no doubt used them profitably in trade or otherwise, and now pleads that he ought not to pay the note, because the currency which he received from the plaintiff, and which he has profitably used was *illegally* issued by the assumed Confederate Government, which, in point of *fact*, exercised dominion and control over both of them at the time the contract was made, and recognized the *validity* of the currency for which the note was given. The contract was made in view of the *state of facts* which existed at the time it was made, and not

Miller *vs.* Gould.

having any connection whatever with the *prosecution of the war* against the United States, it was a legal and valid contract as between *the parties themselves*.

But it is contended that the Constitution of 1868 declares *this contract* to be illegal and void. If the Constitution of 1868 had declared that the *issuing* of Confederate Treasury notes by the assumed Confederate Government, or that the notes which have been so issued, was *illegal and void,* then the contract now sued on would be a *mere nudum pactum.* The Constitution of 1868, however, does *not declare* that the issuing of Confederate Treasury notes, or that the Treasury notes *issued* by the assumed authority of the Confederate Government, shall be illegal and void, but on the contrary, impliedly at least, recognizes that currency, in the sixth section of the tenth article thereof, when it declares that judgments rendered during the war shall be subject to be explained " as to the meaning of the word dollars as used in the same," that is to say, whether the word dollars meant gold or silver dollars or *Confederate Treasury note dollars.* The bald, *naked assumption* is, that the Constitution of 1868 " not only declares *this contract* to have been, and to be *illegal,* when the Confederate Government, in aid of the rebellion, issued these evidences of debt to a citizen or subject of that Government, but it also declares the evidences of debt so issued or used to be null and void. The *assumption* is, it will be perceived, that the Constitution of 1868 declares this contract *now sued on* to have been, and to be, illegal, *when the Confederate Government, in aid of the rebellion, issued these evidences of debt,* (to-wit,) *Confederate Treasury notes to a citizen of that Government*; that is the *first assumption* to maintain the illegality of this contract. The second *assumption* is, that the Constitution declares *the evidences of debt so issued or used,* (to-wit,) Confederate Treasury notes, to be *null and void.* Now let us examine the Constitution of 1868, and see whether " the evidences of debt" mentioned therein embraces, or was intended to embrace, *Confederate Treasury notes issued by that assumed Government.* The consideration of the contract now sued on is Confederate Treasury notes. The *evidence of*

*the debt* now sued on is the promissory note made by the defendant. The Constitution of 1868 declares that "All contracts made and not executed during the late rebellion, with the *intention* and for the *purpose* of aiding and encouraging said rebellion, or where it was the *purpose* and *intention* of any one of the parties to such contract to aid or encourage such rebellion, and that fact was known to the other party, ·whether said contract was made by any person or corporation with the State or Confederate States, or by a corporation with a natural person, or between two or more natural persons, are hereby declared to have been, and to be illegal, and all bonds, deeds, promissory notes, bills, or other evidences of debt, made or executed by *the parties to such contract,* or either of them, in *connection* with such illegal contract, or as the consideration therefor, or in furtherance thereof, are hereby declared null and void, and shall be so held in all Courts of this State when attempt shall be made to enforce any *such contract,* or give validity to any such obligation or evidence of debt." It is not pretended that the *contract* between the parties now before the Court was made with the *intention,* or for the *purpose,* of aiding or encouraging the rebellion, but on the contrary, it was a contract made between two citizens in the ordinary course of business, having no connection whatever with the rebellion, and the promissory note *now sued on* is not such an *evidence of debt* as is declared to be illegal and void by the Constitution. The contracts declared *illegal* by the Constitution are such as were made with the *intention,* and for the *purpose,* of aiding and encouraging the rebellion—contracts for the purchase of artillery or cavalry horses, contracts for the employment of substitutes in the army, or contracts for the purchase of munitions of war, and other contracts of like character, and not contracts made between two citizens for the loan of Confederate Treasury notes, the common currency of the country, which had no connection whatever with the rebellion, and the contracting parties had no *intention* or *purpose* to aid or encourage the same. The *fatal error* in the argument to sustain the illegality of this contract is in *assuming* that the Constitution

Miller *vs.* Gould.

declares that the *issuing* of Confederate Treasury notes by that assumed Government is *illegal*, and that *somebody* has made a *contract* with that Government for the *issuing* such notes, and that such notes being the consideration of the note *now sued on*, therefore, the contract between the parties in *this case* is null and void, a *mere nudum pactum*.   There being no evidence in the record going to show that the contract between the parties in *this case* is embraced, or was intended to be embraced within the provisions of the Constitution, declaring void all contracts made with the *intention*, and for the *purpose* of aiding and encouraging the rebellion, it is the judgment of a majority of the Court that the judgment of the Court below be affirmed.

Judgment affirmed.

WARNER, J.—The case of the Georgia Railroad and Banking Company vs. F. M. Eddleman, involved the same question as that in Miller vs. Gould, both cases were argued together, and the judgment of the Court in that case controls this.   Judgment affirmed.

McCAY, J., concurred, but wrote out no opinion.

BROWN, C. J., dissenting.

. I regret my inability to concur with the majority of this Court in the judgment rendered in this case.   I admit that the natural equities are strongly in favor of the defendant in error, who was the plaintiff in the Court below.   At the time he loaned the Confederate Treasury notes to the plaintiff in error, they formed almost the exclusive currency of this State, and had a market value in gold, and were received in all commercial and other business transactions as a circulating medium.

1. When this loan was made the people of the Confederate States, numbering over ten millions, and inhabiting a territory as large as several of the monarchies of Europe, had thrown off the authority of the Government of the United States, had set up in its place a government fully organized

in all its parts, Executive, Legislative and Judiciary, had organized and then kept large armies in the field, who had maintained its claims as an independent power with an undaunted courage and intrepid valor which challenged the admiration and commanded the respect of the civilized world.

The Federal Government had virtually declared war against this confederation of States, had proclaimed its ports in a state of blockade, had recognized it as a belligerent power authorized to conduct war, and had entered into cartels for the exchange of prisoners with it. This recognition of belligerent rights in the Confederacy by the Government of the United States was followed by similar recognitions by foreign Governments.

Now all must admit that money is not only necessary to conduct wars, but that it is the strongest sinew of war, and it would seem that the recognition of the Confederacy, which had vast armies in the field, as a power authorized to conduct war, upon the principles established by international law, for the government of civilized States engaged in martial combat, carried with it the further recognition of the right of the belligerent power to raise money by the use of its credit, and to issue and circulate notes or bonds for that purpose. That would seem, *as between the subjects* of the belligerent power, to be a sufficient consideration to support a contract made in the ordinary course of business, without any connection with the Government, or any intention to aid it, but simply as a commercial transaction, when there was no other currency in the country except these notes, which were recognized by all as the medium of exchange or standard of value.

This view of the question is strengthened when taken in connection with the well known maxim in government, that protection and allegiance are reciprocal obligations. The Government of the United States was at that time unable to afford protection to the people of the Confederate States. Its authority was displaced, its Courts were suspended, and it could command no officer, civil or military, within the limits of this State. Another government, complete in all its parts, was then supreme in Georgia.

Miller *vs.* Gould.

It is no answer to say that the great body of the people of Georgia, and the other Confederate States, aided the rebellion, and thereby lost their right to the protection of the Government. There were still persons in Georgia (very few, it is true,) who adhered to the Government of the United States, and were loyal to it. *They* were certainly entitled to protection, and if the Government was unable to protect them, it had no right to claim their allegiance till it re-asserted its powers and extended its protection over the territory of their residence. See 4 Wheaton, 246; 2 Gallison, C. C. Reps., 485; 9 Cr., 191; 3 Pet., 242. They were therefore obliged to submit to the existing Government, and as they were obliged to make a living, and to have intercourse with those around them, they had no alternative but to use Confederate Treasury notes, the currency of the country, in their daily transactions. As the Government of the United States gave them no better currency, it would be a harsh rule for it to lay down that all their dealings and pecuniary transactions among themselves were illegal and void, when they were the result of uncontrollable necessity growing out of its failure to afford them protection.

For these and other considerations, I should feel strongly inclined to concur with the majority of this Court in the judgment they have pronounced, were it not for the emphatic and imperative language of our own State Constitution, which my oath of office binds me to support.

2. The 17th section of the 5th article of the new Constitution of this State contains the following language: "All contracts made and not executed during the late rebellion, with the intention and for the purpose of aiding and encouraging said rebellion, or when it was the purpose and intention of any *one of the parties* to such contract to aid or encourage such rebellion, and that fact was *known* to the other party, whether said contract was made by any person or corporation with the State or Confederate States, or by a corporation with a natural person, or between two or more natural persons, are hereby declared *to have been* and to *be illegal;* and all *bonds, deeds, promissory notes, bills, or other evidences of debt,*

made or executed by the parties to such contract, or either of them, in connection with such illegal contract, or as the *consideration* therefor, or in furtherance thereof, are hereby declared *null* and *void,* and shall be *so held in all Courts* in this State, when an attempt shall be made to enforce any such contract, or *give validity* to such obligation or *evidence of debt.* And in all cases where the defendant, or any one interested in the event of the suit, will make a plea, supported by his or her affidavit, that he or' she has reason to believe that the obligation or *evidence of indebtedness* upon which the suit is predicated, or some part thereof, *has been given or used* for the illegal purpose aforesaid, the burden of proof shall be upon the plaintiff to satisfy the Court and jury that the bond, deed, note, bill, or other evidence of indebtedness upon which said suit is brought, is, or are not, nor is any part thereof, *founded upon,* or in any way connected with, any such illegal contract, *and has not been used in aid of the rebellion;* and the date of such bond, deed, note, bill or other evidence of indebtedness, shall not be evidence that it has or has not, since its date, been issued, transferred, or *used* in aid of the rebellion."

Now, it does seem to me, that this provision of the Constitution is conclusive against the judgment of this Court in this case. It declares all contracts made and not executed, " by any person or corporation *with* the State or *Confederate States illegal,* and all bonds, deeds, promissory notes, bills, or other evidences of debt, made or executed *by* the parties to such contract, or *either* of them, *in connection* with such illegal contract, *null and void.* I presume no *candid man* will deny that Confederate Treasury notes were issued by the Confederate Government in aid of the rebellion. All contracts made by that Government for the purchase of artillery, army supplies, payment of troops, and for all other war purposes, were met by it by the issue and use of its notes. The first issue was in every case a contract between that Government and some person or corporation in aid of the rebellion, and each Treasury note was issued by the Government for that very purpose, which fact was well known to the person

Miller *vs.* Gould.

who received it.   It follows, therefore, beyond controversy, that every such contract was a contract made by a person or corporation with the Government of the Confederate States in aid of the rebellion.   Every such contract is therefore declared illegal by the Constitution of 1868, and every such Treasury note issued by the Confederate Government *in connection* with such illegal contract, is declared null and void. No denial of the facts of history, and no ingenious sophistry, can escape this conclusion or change this well known fact.

3. All *executory* contracts made during the rebellion, with a view of aiding or encouraging it, where such was the intention of *one* of the parties, and that fact was *known* to the other, no matter who were the parties, are expressly declared to *have been* and to *be illegal.*

But it does not stop here.   It goes further, and leaves nothing to inference.   It declares that *all bonds, deeds, promissory notes, bills, or other evidences of debt,* made or executed by the parties to such contract, or either of them, in connection with, or as the *consideration* of, or in furtherance of, such illegal contract, are *null* and *void,* and shall be so held in all Courts in this State where attempt shall be made to enforce such contract, *or give validity* to any such obligation or *evidence of debt.*

Strong and conclusive as this language is, it is made still more certain, if possible, by the further provision, that if the defendant, or any one interested in the event of this suit, will make a plea, supported by affidavit, that he has reason to believe the *evidence of indebtedness* upon which the *suit is predicated,* or some part thereof has been *used* for the illegal purpose aforesaid, the burden of proof shall be upon the plaintiff to satisfy the Court and the jury that the *evidence of indebtedness* is not *founded upon,* or in any way connected with, any such illegal contract, and *has not been used in aid of the rebellion,* before he can recover, and the date of the obligation or evidence of indebtedness is not to be evidence whether it has or has not been *used* in aid of the rebellion.

Now let it be borne in mind that Confederate notes were issued by the Confederate Government to aid it in the execu-

tion of its designs to set up an independent Government, and that this fact was *known* by every person who received such notes from that Government, and by all persons who subsequently received them in any transaction whatever. No one can plead want of notice. It follows, therefore, that the first issue of every such note was such a contract as the Constitution declares to be *illegal,* and that the note itself, which carries upon its face *notice* of this fact, is declared by the same Constitution to be *null* and *void.*

4. To all this it may be replied, that this suit was not brought upon the Confederate notes, which are null and void, but upon a note given by Miller to Gould *for* Confederate notes. This is true, and we are here brought to the consideration of *the question* made by this record. Can a note or other evidence of debt, which is declared by a statute or by the Constitution, which is of even higher dignity than a statute, to be illegal, null and void, be a sufficient *legal consideration* to support a contract? It is not denied that such note may have a market value, but the question is, can it have *a legal value,* and can a Court, under our Constitution, give *validity* to it by sustaining a contract for which it is the only consideration?

While there have been comparatively few instances, in which a note or other evidence of debt has been declared by statute to be illegal, null and void, I take it to be a well established rule, supported by an unbroken current of authorities, that no recovery can be had upon such a note or other evidence of debt, and that it can not be a legal consideration for another note, or to support any other contract.

The most familiar instances of this kind in the books, grow out of the statutes against gaming and usury. These statutes declare that notes given for gaming considerations, or for usury, are *void,* and the Courts have held that no recovery could be had upon such notes, even in the hands of a *bona fide* purchaser without notice of the illegality of the consideration.

In the case of Bowyer vs. Bampton, 2 Strange, 1155, the suit was upon several promissory notes given for money

Miller *vs.* Gould.

knowingly advanced to game with, in violation of the statute of 9 Anore. The notes had been indorsed by Church, the payee, to the plaintiff, for a valuable consideration without privity or notice, and it was held, after two arguments, that the innocent endorser could not recover upon them, for the reason, as the Court said, that to allow the recovery, even by the *bona fide* holder, without notice, is making the note of *some use* to the lender, if he can pay his own debts with it.

Comyn on Cont. 61, after referring to the Acts of 33 Hen., 8, 16 Car., 2 and 9 Ann, lays down the same rule in these words : " And these acts having declared the security void, it may be observed that a bill of exchange, given for money won at play, can not be recovered upon, though in the hands of an endorser for a valuable ·consideration, and who is totally ignorant of the circumstances affecting the security." See also Cannon vs. Bryce, 3 B. and Ald., 179 ; ·Byles on Bills, 106 ; Story on Prom. Notes, sec. 1928, note ; 3 Kent's Com., sec. 44, pp. 79 and 80, (5th edition ;) Chitty on Con., 615. So of a note given for an usurious consideration, under the Act of 12th Ann, which the statute declares to be utterly void, upon which no recovery can be had, even in the hands of a *bona fide* holder for a valuable consideration, without notice.

In Lowe vs. Waller, 2 Doug., 735, the action was brought by an innocent endorser, without notice, upon a note given for an usurious consideration, and after the case had been ably argued, Lord Mansfield, delivering the opinion of the Court, said : " I have considered this case very attentively, and I own with a great leaning, and wish, on my part, that the law should turn out to be in favor of the plaintiffs: But the words of the act are too strong. Besides, we can not get over the case of the statute against gaming, which stands on the same ground. This is one of those instances in which private must give way to public convenience." Lord Ellenborough made the same ruling in the case of Lowis vs. Mazzaredo, 1 Starkie's Rep., 386.

Thus the law stood in England, till the statute 58, Ga., 3,

changed it, and declared that such bills or notes given for usury shall not be void, in the hands of an endorser for a valuable consideration, without notice. But it has been held under the statute, that the holder of a bill who sues thereon must prove that he holds it for value, so soon as the defendant has shown that there was usury between prior parties to the instrument. Chitty on Con., 612.

The statute of this State, passed 27th March, 1759, establishes eight per cent. as the legal rate of interest, and declares all bonds, contracts and assurances, given for a greater per cent. *utterly void.* Marb. & Craw, Dig. 270. This act was amended by the Act of 22d December, 1822, which declared that such contracts, bonds, etc., " shall not be void, but the principal due thereon shall be recoverable at law, and no more."

In the case of *Baily vs. Lumpkin,* 1 *Ga.,* 392, this Court was called upon to put a construction on this Act, and it was held that the note as to the interest was void, and that a note given for such usurious interest was void in the hands of a *bona fide* holder without notice. Nisbet. J., delivering the opinion of the Court, says: " It is very true that the Courts in England struggled hard to protect an innocent indorser against the plea of usury, because of the obvious hardship of the case. They, however, did yield to the irresistible force of the reasoning upon this subject, and determined that a security *void by statute,* as in the case of usury and gaming, was void in the hands of a *bona fide* holder without notice. The security being *utterly void* by law, it could acquire nowhere and in no way any vitality. A transfer for value to one ignorant of the taint could not breathe life into the contract. *Void* in the beginning, it was *void* forever and everywhere. The other reason for this determination of the British Courts is this: if an usurious contract could be enforced in the hands of a third person, then it would be the easiest thing imaginable to defeat the statute of usury. The public policy of the laws against usury imperiously required such a decision. It was consequently made, and for a long series of years acquiesced in." See also 3 Johns. Cases, 206; 1

Miller *vs.* Gould.

Bay, 28; 1 Greenleaf R., 167; 2 Caine's Reps., 150; 10 Mass., 121; 3 Doug. Reps., 268. And as to illegality of consideration see Chitty on Cont., 574; Addison on Cont., 91; Story on Sales, sec. 499; Byles on Bills, 103; Comyn on Cont., 59.

It is abundantly established by the authorities cited, that the market value of the note or bill at the time of the sale can not be taken into the consideration. The gaming notes, and notes given for an usurious consideration, in each of the above cases, had a market value. In each case the *bona fide* holder purchased without notice, and paid, and the payee received, a valuable consideration for the note or bill. But they had no *legal* value, because declared void by statute, and therefore no recovery could be had upon them, no matter in whose hands they might be.

But let us pursue the inquiry a little further. Can a recovery be had in a Court established by the Constitution, upon a note given for a consideration which the Constitution declares null and void? If authority is to govern, unquestionably it cannot. In Craig *et al.* vs. The State of Missouri, 4 Pet. 410, the Supreme Court of the United States has decided that no such recovery can be had. By Act of 27th June, 1821, the Legislature of the State of Missouri established loan offices, and directed the officers of the Treasury, under the direction of the Governor, to issue certificates to the amount of $200,000, of denominations not exceeding ten dollars nor less than fifty cents. These certificates were to be receivable at the Treasury, and by the tax gatherers and other public officers, in payment of taxes or. money due, or to become due to the State, or to any town or county therein; and by all officers, civil and military, in the State, in discharge of salaries and fees of office, and in payment for salt made at the salt springs, owned by the State, and to be afterwards leased by the authority of the Legislature. A provision was made by law for the gradual withdrawal of the certificates from circulation, and all the certificates had been withdrawn and redeemed by the State at the time the litigation was pending.

It was also provided by the statute that the commissioners might loan said certificates, in sums less than $200 00, on personal securities, by them deemed good and sufficient, which securities should be jointly and severally bound for the payment of the amount so loaned, with interest thereon. Craig borrowed the certificates thus issued, and gave his note, signed also by John Moone and Ephriam Moone, for $199 99, which certificates had a full par value, and were used as money by the maker of the note, and afterward redeemed by the State at full par value. There was, therefore, no pretence that there was in fact any failure of consideration. Craig borrowed the certificates and gave his note for them in that case, as Miller borrowed the Confederate Treasury notes, and gave his note for them, in this case. The cases are alike, with this difference, that the certificates borrowed by Craig were worth par in the market. Those borrowed by Miller, the plaintiff in error, in this case, were worth about fifty cents in the dollar when he received them. In that case the statute of Missouri declared the certificates and the notes given for them, valid. In this case the Constitution of Georgia declares the Confederate Treasury notes, issued in aid of the rebellion, null and void. That was, then, a stronger case in favor of the plaintiff in the Court below than the case at the bar.

In that case the Supreme Court of the United States, Chief Justice Marshall delivering the opinion, held that the certificates issued by the State of Missouri were bills of credit, and as the Constitution of the United States declares that no State shall "emit bills of credit," these certificates or bills of credit issued by the State of Missouri were void, and being void, as prohibited by the constitution, that they were not a legal consideration to support a contract, and that no recovery could be had upon the note given by Craig for them, notwithstanding they were worth par in the market when he secured them, and were used by him as money.

I make the following quotation from Chief Justice Marshall's opinion in that case, which is so strongly in point in this that I make no apology for its length : "The certificates for

which this note was given being, in truth, 'bills of credit,' in the sense of the constitution, we are brought to the inquiry: 'Is the note valid of which they form the constitution? It has long been settled, that a promise made in consideration of an act which is forbidden by law, is void. It will not be questioned, that an act forbidden by the Constitution of the United States, which is the supreme law, is against law. Now the constitution forbids a State to 'emit bills of credit.'" The loan of these certificates is the very act which is forbidden. It is not the making of them while they lie in the loan offices; but the issuing of them, the putting them into circulation, which is the act of emission, the act that is forbidden by the constitution. The consideration of this note is the emission of bills of credit by the State. The very act which constitutes the consideration, is the act of emitting bills of credit, in the mode prescribed by the law of Missouri, which act is prohibited by the Constitution of the United States. Cases which we cannot distinguish from this in principle, have been decided in State Courts of great respectability, and in this Court. In the case of the Springfield Bank vs. Merrick, *et al.,* 14 Mass., 322, a note was made payable in certain bills, the loaning or negotiating of which was prohibited by statute, inflicting a penalty for its violation. The note was held to be void. Had this note been made in *consideration* of those bills, instead of being made payable in them, *it would not have been made less repugnant to the statute,* and would consequently have been equally *void.*

In Hunt vs. Knickerbocker, 5 Johns. Rep., 327, it was decided that an agreement for the sale of tickets in a lottery, not authorized by the Legislature of the State, although instituted under the authority of the government of another State, is contrary to the spirit and policy of the law, and void. The consideration on which the agreement was founded being illegal, the agreement was void. The books, both of Massachusetts and New York, abound with cases to the same effect. They turn upon the question whether the particular case is within the principle, not on the principle

itself. It has never been doubted, that a note given on a consideration which is prohibited by law, is void. Had the issuing or circulation of certificates of this or any other description been prohibited by a statute of Missouri, could a suit have been sustained in the Courts of that State, on a note given in consideration of the prohibited certificates? If it could not, are the provisions of the constitution to be held less sacred than those of a State law?

It had been determined, independently of the Act of Congress on that subject, that sailing under the license of an enemy is illegal. Patton vs. Nicholson, 3 Wheat., 204, was a suit brought in one of the courts of this district, on a note given by Nicholson to Patton, both citizens of the United States, for a British License. The United States were then at war with Great Britain; but the license was procured without any intercourse with the enemy. The judgment of the Circuit Court was in favor of the defendant, and the plaintiff sued out a writ of error. The counsel for the defendant in error was stopped, the Court declaring that the use of a license from the enemy being unlawful, one citizen had no right to purchase or sell to another such a license, to be used on board an American vessel. The consideration for which the note was given being unlawful, it follows, of course, that the note was void. A majority of the Court feels constrained to say, that the consideration on which the note in this case was given, is against the highest law of the land, and that the note itself is utterly void."

It is proper to remark that three of the Justices dissented from the opinion of the Court, on the ground that the certificates issued by the State of Missouri were not, in their opinion, bills of credit within the meaning of the constitution.

Mr. Justice Johnson, in his dissenting opinion, admits that the note given for the certificates would be void, if they were bills of credit, prohibited by the constitution. His language is:

"In the argument of counsel the objections to this contract were presented in the form of objections to the con-

sideration.   But this was unnecessary to his argument, since even a valuable consideration will not make good a contract in itself illegal.   These notes originate directly under the law of Missouri; they are taken in pursuance of its provisions, have their origin in it, and rest for their validity upon it, and if that law be void, must fall with it.   Whether, therefore, the bills for which they were given be void or valid, if the law be void, the notes would be so."

The case of Sherman, survivor, vs. Barnard, in 19th Barb. Reps., 291, fully sustains the position for which I contend. The Legislature of New York, on the 10th of July, 1851, had passed an Act "to provide for the completion of the Erie Canal enlargement, and Genesee Valley and Black River Canals," which provided for the issue of a large amount in certificates of indebtedness for the completion of the work. Barnard sold and transferred a certain written contract, with all his rights therein, to Sherman and Moore, which was made between himself of the one part, and the canal commissioners and the division engineers on behalf of the people, of the other part, by which it was agreed that Barnard should construct a certain section of the Erie Canal enlargement, and should be paid therefore a compensation provided by said contract, out of the surplus revenues of the canals, and the proceeds of sales of canal revenue certificates, as authorized by said Act.   And Sherman and Moore executed several promissory notes, amounting in the aggregate to $2,000 00, and delivered them to Barnard for his interest in said contract.   At the time of the trade a case was pending before the Court of Appeals of New York to test the constitutionality of the Act authorizing the canal enlargement, and the issue of said certificates, and it was agreed by Sherman and Moore to take the risk and pay the $2,000 00, whatever might be the decision of the Court of Appeals as to the constitutionality and validity of the Act, or as to the validity of contracts made under it.

The Court of Appeals afterwards decided, 3 Selden, 9, that the Act was unconstitutional and void, and as a consequence, that the contracts made and certificates issued under it were

unauthorized, and that the people of the State were not in in any sense bound by them.

After this decision, Sherman, as the surviving member of the firm, filed his bill to enjoin Barnard from transferring the notes, and to compel him to deliver them up to be cancelled, and prayed that Sisson and Chapman, to whom Moore had made part payment for Barnard, be restrained from paying over the money to Barnard, etc. The Court below held that Barnard was entitled to recover upon the notes, and upon appeal, the Supreme Court reversed the decision, and ruled that the sale of an absolutely void chose in action will not form any consideration for a promise. Judge Strong, delivering the opinion of the Supreme Court, says: "But independent of the decision, the naked legal proposition that the sale of an absolutely void chose in action will not form any consideration for a promise is, I think, incontrovertible. If void, no legal obligation is created by it, and it is in view of the law, as if it did not exist. Void things are as no things, and some value is essential to a valid consideration. (Story on Contracts, sec. 443.) The principle is the same, notwithstanding such chose in action, is saleable in market for even the full value that would attach to it if valid. If the law does not recognize it as having some binding force, and will not enforce it, a note given for the sale of it will be invalid for want of consideration. It has no intrinsic, no legal value, and therefore in law no value. Although saleable in market, if the sale is on credit, no legal debt is thereby created; payment may be resisted for want of consideration, and if the sale is for cash, if the money paid can not be received back, it is not because a consideration was received for it, but upon the principle which precludes the recovery of money voluntarily paid with a full knowledge of all the facts."

Rodman vs. Munson, 13 Barbour, 63, involves the same question as to the validity of a note given for part of said "canal revenue certificates," referred to in the case last cited. The Court in this case holds the Act authorizing the Comptroller to issue the certificates to be unconstitutional and

Miller *vs.* Gould.

inoperative, and the certificates to be wholly null and void, and that the note given for said certificates is without consideration, and that its payment can not be enforced.

The same question was again before the Court, in the same volume, p. 188, and the same judgment was pronounced. On pages 194 and 195, the learned Judge, after stating that the defense set up is that the note was given for canal revenue certificates under the Act of 1851, which is in conflict with the constitution, and that the certificates did not constitute a consideration to support the note, uses this language: " The first point raised by the plaintiff's counsel is, that the canal revenue certificates had a marketable value, which was at all events a sufficient consideration for the note. But the fact that a paper would sell in market does not of itself, render it available as a consideration, as there are many who would willingly purchase counterfeit bills, or notes given for gambling debts, or otherwise *contra bonos mores*, but surely none of these would give validity to a contract. The rule is, that a consideration is sufficient when it has any *legal* value, but insufficient where it has none. It was so laid down substantially in the case of Johnson vs. Titus, (2 Hill, 606,) quoted by the plaintiff's counsel, and the authorities there cited by the late Judge Cowen. The important question in this case is, whether the canal revenue certificate was *in law valueless*, and it certainly was so, if the act under which it was issued was unconstitutional."

It has been decided that there can be no recovery on a note given for the purchase of a ticket in a lottery prohibited by law. Hawkins vs. Cox, 2 Cr. C. C., 173, and in Thompson vs. Milligan, Ibid, 207. So, in New Jersey, a conveyance founded on a lottery consideration, is void, though the lottery was contrived and drawn in another State. 4 W. C. C., 129.

The statute 24 Ga., 2, c. 40, prohibits persons from recovering a debt incurred by sale of spirituous liquors, in less quantities than of the value of twenty shillings, and when part of the consideration for a bill was spirituous liquors within the statute, and part for money lent, it was holden

wholly void in the hands of the payee. So a bill of exchange accepted to secure payment of money, taken at the door of an unlicensed theatre, is void in the hands of the payee, who knew the theatre to be unlicensed. Byles on Bills, 110. An action cannot be maintained to recover the price or value of libelious or immoral pictures sold by the plaintiff to the defendant. Forbes vs. Johns, 4 Esp., 97. And Best, C. J., held that the plaintiff, a printer, could not recover any remuneration for printing "The Memoirs of Harriet Wilson," it being a work of grossly immoral and libelous character. Poplett vs. Stockdale, R. and M., 357.

In all these cases, as in the case at bar, the consideration of the note or bill had ·a marketable value, and the maker of the note received actual value. But as the law declared the consideration to be illegal and void; as the Constitution of Georgia declares the Confederate notes in this case, "to have been and to be," no recovery could be had, because the consideration had no legal value. There must not only be a consideration, but in the just sense of the law it must be legal as well as adequate. Story on Prom. Notes, sec. 183; Chitty on Bills, ch. 3, sec. 1, p. 78–85, (8 ed., 1833;) Bayley on Bills, ch. 12, p. 494–495, (5 ed., 1830.

The Courts will not enforce a contract founded on a dealing in Confederate Treasury notes. Nordlinger vs. Vaiden, 2 Am. L. Rev., 188. Bank of Tennessee vs. The Union Bank, Ibid; 346.

The same ruling has been made by Judge Erskine, the learned and able United States District Judge for this State, in the case of Baily, Trustee, vs. Milner, reported in 35 Ga. Reps., 330; and Scudder vs. Thomas, 35 Ga., 364.

I might multiply authorities, but deem it useless. Those already cited seem to me to establish the position beyond all question that there was no legal consideration for the note, which is the foundation of this suit, and that the judgment of the Court below ought to be reversed.

5. Before concluding this opinion I remark that the Constitutional provision applies only to *executory* contracts, or to cases where an effort is made to give validity to bonds, deeds,

bills, or other evidences of debt, used in aid of the rebellion, and not to contracts which have been fully executed by the parties.    If Miller had paid the amount called for by this note to Gould, the Courts would not aid him to recover it back.    In all cases of contracts made during the war, in which Confederate Treasury notes were used, and the contract fully executed, the Courts will aid neither party, but will leave them where they find them.    *In pari delicto potior est conditio defendentis.*